## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

### RICHMOND DIVISION

| | |
|---|---|
| MARTY HINTON, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>ATLANTIC UNION BANK,<br><br>        Defendant. | Civil Action No. 3:20-cv-651-JAG |

### CLASS ACTION COMPLAINT

Plaintiff Marty Hinton, individually and on behalf of all others similarly situated, complains and alleges as follows based on personal knowledge as to himself, on the investigation of his counsel, and on information and belief as to all other matters:

### INTRODUCTION

1. On August 20, 2020, the Court ordered Plaintiff to file this Class Action Complaint setting forth his allegations against Atlantic Union Bank. No. 3:19-cv-849-JAG (ECF No. 45).

2. This is a civil action seeking monetary damages, restitution and injunctive and declaratory relief from Defendant, Atlantic Union Bank ("Atlantic Union" or "Defendant"), arising from the unfair and unconscionable assessment and collection of overdraft fees ("OD Fees") on accounts that were never actually overdrawn.

3. Atlantic Union's customers have been injured by Atlantic Union's improper practices to the tune of millions of dollars bilked from their accounts in violation of their agreements with Atlantic Union.

4. On behalf of himself and the Class, Plaintiff brings claims for breaches of contract and the covenant of good faith and fair dealing and violation of the Electronic Fund Transfers Act

(Regulation E) C.F.R. § 1005 *et seq*., and seeks actual and statutory damages, restitution, injunctive relief, and attorneys' fees and costs of suit pursuant to 15 U.S.C. § 1693m for Atlantic Union's violations as set forth more fully below.

## JURISDICTION

5.      This Court has jurisdiction over this putative class action lawsuit pursuant to the 28 U.S.C. § 1331 because Plaintiff alleges that Defendant violated the Electronic Fund Transfers Act (Regulation E) C.F.R. § 1005 *et seq*.  This Court also has jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) & (6), because the aggregate sum of the claims of the members of the putative Class exceeds $5 million, exclusive of interest and costs, because Plaintiff brings this action on behalf of a proposed Class that is comprised of over one hundred members, and because at least one of the members of the proposed Class is a citizen of a different state than Atlantic Union.

## PARTIES

6.      Plaintiff Marty Hinton ("Plaintiff") is a natural person who is a citizen and resident of Virginia.  Plaintiff has a checking account with Atlantic Union.

7.      Defendant Atlantic Union is a bank with approximately $17 billion in assets. Atlantic Union is one of the largest banks based in Virginia.  Atlantic Union is headquartered in Richmond, VA and maintains branch locations across Virginia, Maryland and North Carolina.

8.      Plaintiff is informed and believe, and thereupon allege, that at least one of the members of the proposed Class is a citizen of a state other than the Commonwealth of Virginia.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

I.      **ATLANTIC UNION CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT**

A.      **Overview of Claim**

9.      Plaintiff brings this cause of action challenging Atlantic Union's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Purportedly

Settle Negative Transactions" ("APPSN Transactions").

10.     Here's how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Atlantic Union immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the consumer's displayed "available balance" reflects that subtracted amount. As a result, customers' accounts will always have sufficient available funds available to cover these transactions because Atlantic Union has already sequestered these funds for payment.

11.     However, Atlantic Union still assesses crippling $36 OD Fees on many of these transactions, and mispresents its practices in its account documents.

12.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Atlantic Union later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance.  These types of transactions are APPSN Transactions.

13.     Atlantic Union maintains a running account balance in real time, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Atlantic Union sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

14.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed

in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending

Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration,

Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

15.     That means when any *subsequent*, intervening transactions are initiated on a

checking account, they are compared against an account balance that has already been reduced to

account for any earlier debit card transactions. This means that many subsequent transactions incur

OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

16.     Still, despite keeping those held funds off-limits for other transactions, Atlantic

Union improperly charges OD Fees on those APPSN Transactions, although the APPSN

Transactions *always* have sufficient available funds to be covered.

17.     Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed

concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in

these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights," https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf, at 8-9 (last accessed Jan. 21, 2020).

18.     There is no justification for these practices, other than to maximize Atlantic Union's OD Fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But Atlantic Union is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But Atlantic Union was not content with these millions in OD Fees. Instead, it sought millions *more* in OD Fees on these APPSN Transactions.

19.     Besides being unfair and unjust, these practices breach contract promises made in Atlantic Union's adhesion contracts—contracts which fail to inform consumers about the true nature of Atlantic Union's processes and practices. These practices also exploit contractual discretion to gouge consumers.

20.     In plain, clear, and simple language, the checking account contract documents covering OD Fees promise that Atlantic Union will only charge OD Fees on transactions that have insufficient funds to "cover" that debit card transaction.

21.     In short, Atlantic Union is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**B.     Mechanics of a Debit Card Transaction**

22.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Atlantic Union. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to Atlantic Union, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

23.     At this step, if the transaction is approved, Atlantic Union immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction, but does not yet transfer the funds to the merchant.

24.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

25.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

26.     Atlantic Union (like all banks) decides whether to "pay" debit card transactions at authorization.  After that, Atlantic Union is obligated to pay the transaction no matter what.  For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined.  It is at that point—and only that point—when Atlantic Union may choose to either pay the transaction or decline it. When the time comes to actually settle the transaction, it is too late—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

27.     There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

**C.      Atlantic Union's Account Contract**

28.     Plaintiff has an Atlantic Union checking account, which is governed by Atlantic Union's standardized "Deposit Account Terms and Conditions" document ("Deposit Agreement"), Ex. A.

29.     The Overdraft Disclosure, also part of the contract, repeatedly represents that "authorization" and "payment" of debit card transactions is coterminous and represents that OD Fees are assessed at the moment an accountholder "uses" his card:

> We offer 3 options for overdraft coverage - Overdraft Privilege, Overdraft Transfer or Overdraft Line of Credit. They're designed to cover accidental overdrafts when you write a check, make withdrawals at a branch or ATM or **when you use your debit card**.
>
> […]

At our discretion, **we may authorize and pay overdraft transactions**.

[…]

Fees may be imposed for covering overdrafts created by check, in-person withdrawal, ATM withdrawal, or other electronic means such as a debit card. **Atlantic Union Bank does not authorize and pay overdrafts for ATM and one-time debit card transactions unless we receive authorization from you to opt in to that service**.

Atlantic Union Bank, Overdraft Services, Ex. B at 2.

30.     The overdraft opt-in form again links "authorization" and "payment" as coterminous:

__ I want Atlantic Union Bank to *authorize and pay* overdrafts on my ATM and everyday debit card transactions. I understand that I have an ongoing right to revoke this consent at any time.

___I do not want Atlantic Union Bank to *authorize and pay* overdrafts on my ATM and everyday debit card transactions.

https://www.atlanticunionbank.com/personal/resources/overdraft-services/overdraft-choice-form (emphasis added) (last accessed June 30, 2019).

31.     The Deposit Agreement also provides that Atlantic Union makes overdraft determinations when it decides to "honor" transactions, which is the moment of authorization for debit card transactions:

Overdrafts - You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. However, the fact that we may honor withdrawal requests that overdraw the account balance does not obligate us to do so later…So you can NOT rely on us to pay overdrafts on your account regardless of how frequently or under what circumstances we have paid overdrafts on your account in the past…You agree that we may charge fees for overdrafts.

[…]

If an item is presented without sufficient funds in your account to pay it, we may, at our discretion, pay the item (creating an overdraft) or return the item (resulting

8

in a NSF). Overdraft, NSF, and other fees are disclosed in the Personal Deposit and Business Deposit Fee Schedules.

Ex. A at 3.

32.     For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to cover those transactions—yet Atlantic Union assesses OD Fees on them anyway.

33.     The above promises indicate that transactions are only overdraft transactions when they are "authorized and paid" into a negative account balance. Of course, that is not true for APPSN Transactions.

34.     In fact, Atlantic Union actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to settle those same transactions. Instead, it uses a secret posting process described below.

35.     All the above representations and contractual promises are untrue. In fact, Atlantic Union charges OD Fees even when sufficient funds exist to "cover" transactions that are "authorized and covered" into a positive balance. No express language in any document states that Atlantic Union may impose OD Fees on any APPSN Transactions.

36.     The Deposit Agreement and Overdraft Disclosure misconstrue Atlantic Union's true debit card processing and overdraft practices.

37.     First, and most fundamentally, Atlantic Union charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions. That is despite contractual representations that Atlantic Union will only charge OD Fees on transactions with insufficient available funds to cover a given transaction.

38.     Next, sufficient funds for APPSN Transactions are actually debited from the

account immediately, consistent with standard industry practice.

39.     Because these withdrawals take place upon initiation, they cannot be re-debited later. But that is what Atlantic Union does when it re-debits the account during a secret batching posting process.

40.     In reality, Atlantic Union's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

41.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds. As such, Atlantic Union cannot then charge an OD Fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

42.     In sum, there is a huge gap between Atlantic Union's practices as described in the account documents and Atlantic Union's practices in reality.

**D.     Atlantic Union Abuses Contractual Discretion**

43.     Atlantic Union's treatment of debit card transactions to charge OD Fees is not simply a breach of the express terms of the numerous account documents. In addition, Atlantic Union exploits contractual discretion to the detriment of accountholders when it uses these policies.

44.     The terms to "authorize and pay" and to "honor" a transaction are undefined. Atlantic Union uses its discretion to define these terms in a manner contrary to any reasonable, common sense understanding of these terms.

45.     Moreover, Atlantic Union uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to

consume available funds previously sequestered for APPSN Transactions.

46.     Atlantic Union uses all of this contractual discretion unfairly to extract OD Fees on transactions that no reasonable consumer would believe could cause OD Fees.

**E.      Reasonable Consumers Understand Debit Card Transactions are Debited Immediately**

47.     The assessment of OD Fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions. That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions). If funds are immediately debited, then, they are necessarily applied to the debit card transactions for which they are debited.

48.     Atlantic Union was and is aware that this is precisely how accountholders reasonably understand debit card transactions to work.

49.     Atlantic Union knows that many consumers prefer debit cards for these very reasons. Consumer research indicates that consumers prefer debit cards as a budgeting device; because they don't allow debt like credit cards do; and because the money comes directly out of a checking account.

50.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." "Help Desk FAQ: What do I need to know about using debit cards?," https://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card (last accessed Jan. 21, 2020).

51.     Further, Consumer Action informs consumers that "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full." "Understanding Debit Cards," Consumer Action, https://www.consumer-action.org/english/articles/understanding_debit_cards (last accessed Jan. 21, 2020).

52.     That is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Cash for Smallest Purchases,* MarketWatch, Mar. 23, 2016, http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23 (last accessed Jan. 21, 2020).

53.     Not only have consumers increasingly transitioned from cash to debit cards, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

54.     Atlantic Union was aware of a consumer perception that debit transactions reduce an available balance *in a specified order*—namely, the moment they are actually initiated—and its account agreement only supports this perception.

**F.     Plaintiff's Debit Card Transactions**

55.     As an example, on December 16, 2019, Plaintiff was assessed an OD Fee in the amount of $36.00 for a debit card transaction that settled on that day, despite the fact that positive funds were deducted immediately, prior to that day, for the transaction on which Plaintiff was

assessed an OD Fee.

## II.    CLASS ACTION ALLEGATIONS

56.    Plaintiff brings this action on behalf of himself and on behalf of all others similarly situated pursuant to Fed. R. Civ. P. 23. The Class is defined as:

> All persons who hold an Atlantic Union checking account who, within the applicable statute of limitations preceding the filing of this lawsuit, were charged OD Fees on debit card transactions that did not overdraw the account (the "APPSN Class" or the "Class").

57.    Excluded from the Class are Atlantic Union, Atlantic Union's subsidiaries and affiliates, their officers, directors and member of their immediate families and any entity in which Atlantic Union has a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

58.    Plaintiff reserves the right to modify or amend the definition of the proposed Class and/or to add a Subclass(es) if necessary before this Court determines whether certification is appropriate.

59.    The questions here are ones of common or general interest such that there is a well-defined community of interest among the members of the Class. These questions predominate over questions that may affect only individual class members because Atlantic Union has acted on grounds generally applicable to the Class.  Such common legal or factual questions include, but are not limited to:

> a)  Whether Atlantic Union improperly charged OD Fees or NSF Fees;
>
> b)  Whether the conduct enumerated above violates the contract;
>
> c)  Whether the conduct enumerated above violates the covenant of good faith and fair dealing;

      d)  Whether Atlantic Union violated Regulation E; and

      e)  The appropriate measure of damages.

60.     The parties are numerous such that joinder is impracticable.  Upon information and belief, and subject to class discovery, the Class consist of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to Atlantic Union's records.  Atlantic Union has the administrative capability through its computer systems and other records to identify all members of the Class, and such specific information is not otherwise available to Plaintiff.

61.     It is impracticable to bring Class members' individual claims before the Court. Class treatment permits a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender.  The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

62.     Plaintiff's claims are typical of the claims of the other members of the Class in that they arise out of the same wrongful business practices by Atlantic Union, as described herein.

63.     Plaintiff is more than an adequate representatives of the Class in that Plaintiff has or had Atlantic Union checking accounts and have suffered damages as a result of Atlantic Union's contract violations, Atlantic Union's violations of the covenant of good faith and fair dealing, and Atlantic Union's unjust enrichment.  In addition:

      a)  Plaintiff is committed to the vigorous prosecution of this action on behalf of themselves and all others similarly situated and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on

behalf of consumers against financial institutions;

b) There is no conflict of interest between Plaintiff and the unnamed members of the Class;

c) Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

d) Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

64.    Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

65.    Atlantic Union has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

66.    All conditions precedent to bringing this action have been satisfied and/or waived.

**FIRST CLAIM FOR RELIEF**

**BREACH OF CONTRACT**
**INCLUDING THE COVENANT OF GOOD FAITH AND FAIR DEALING**
**(On behalf of Plaintiff and the APPSN Class)**

67.    Plaintiff repeats and incorporates by reference the preceding paragraphs.

68.    Plaintiff and all members of the proposed APPSN Class contracted with Atlantic Union for checking account services as set forth in the Deposit Agreement.

69.    All contracts entered into by Plaintiff and the APPSN Class are identical or substantively identical because Atlantic Union's form contracts were used uniformly.

70.    Atlantic Union breached the express terms of its own contracts as described herein.

71.    Plaintiff and members of the APPSN Class have performed all, or substantially all, of the obligations imposed on them under the agreements.

72.    Under the laws of the states and the commonwealth where Atlantic Union does business, good faith is an element of every contract. All contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts

and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts. Plaintiff and all members of the proposed APPSN Class have performed all, or substantially all, of the obligations imposed on them under the contract.

73. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of a power to specify terms.

74. Atlantic Union abused the discretion it granted to itself when it charged OD Fees on debit card transaction previously authorized on sufficient positive funds.

75. In these and other ways, Atlantic Union violated its duty of good faith and fair dealing.

76. Atlantic Union willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing fee revenue from Plaintiff and other members of the APPSN Class.

77. Plaintiff and members of the APPSN Class have sustained damages as a result of Atlantic Union's breaches of the parties' contracts and breaches of contract through violations of the covenant of good faith and fair dealing.

## SECOND CLAIM FOR RELIEF

**Violation of Electronic Fund Transfers Act (Regulation E)**
**C.F.R. § 1005 et seq. (authority derived from 15 U.S.C. § 1693 *et seq*.))**
**(On Behalf of Plaintiff and the Class)**

78.     Plaintiff incorporates by reference the preceding paragraphs.

79.     By charging overdraft fees on APPSN Transactions, Defendant violated Regulation E (12 C.F.R. §§1005 et seq.), whose "primary objective" is "the protection of consumers" (§1005.l(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act 15 U.S.C. §§1693 et seq.), the "EFTA"] (§1005. l(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

80.     Specifically, the charges violated what is known as the "Opt In Rule" of Regulation E (12 C.F.R. § 1005.17.) The Opt In Rule states: "a financial institution ... shall not assess a fee or charge ... pursuant to the institution's overdraft service, unless the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice]. . . describing the institution's overdraft service" and (ii) "[p ]rovides a reasonable opportunity for the consumer to affirmatively consent" to enter into the overdraft program. (Id.) The notice "shall be clear and readily understandable."  (12 C.F.R. §205.4(a)(l).) To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

81.     The intent and purpose of this Opt-In Form is to "assist customers in understanding how overdraft services provided by their institutions operate .... by explaining the institution's overdraft service ... in a clear and readily understandable way"-as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting *Chase*

*Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Regulation Z)).

82.     Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17. Defendant's opt-in method fails to satisfy 12 C.F.R. § 1005.17 because it misrepresents Defendant's overdraft practices, as discussed above.

83.     As a result of violating Regulation E's prohibition against assessing overdraft fees without obtaining affirmative consent to do so, Defendant has harmed Plaintiff and the Class.

84.     Due to Defendant's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, demand a jury trial on all claims so triable and judgment as follows:

A.  Certification for this matter to proceed as a class action on behalf of both proposed Class under Fed. R. Civ. P. 23;

B.  Declaring Atlantic Union's OD Fee policies and practices to be wrongful, unfair and unconscionable;

C.  Restitution of all OD Fees paid to Atlantic Union by Plaintiff and the members of the Class, as a result of the wrongs alleged herein in an amount to be determined at trial;

D.  Actual damages in an amount according to proof;

E.  Injunctive or declaratory relief;

F.  Pre- and post-judgment interest at the maximum rate permitted by applicable law;

G.  Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law;

H.  For attorneys' fees under the common fund doctrine, and all other applicable law; and

I.    Such other relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of himself and the Class, hereby demands a trial by jury pursuant to Fed. R. Civ. P. 38(b) on all claims so triable.

Dated: August 26, 2020

Respectfully submitted,

**/S/**

Patrick T. Fennell (VSB 40393)
**PATRICK FENNELL, ATTORNEY AT LAW, P.C.**
PO Box 12325
Roanoke, VA 24024
Tele: 540-339-3889
patrick@fmtrials.com

Jeffrey Kaliel*
Sophia Gold*
**KALIEL PLLC**
1875 Connecticut Ave. NW 10th Floor
Washington, D.C. 20009
Tel: (202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielpllc.com

Lynn A. Toops*
**COHEN & MALAD, LLP**
One Indiana Square
Suite 1400
Indianapolis, IN 46204
Tel: (317) 636-6481
ltoops@cohenandmalad.com

J. Gerard Stranch, IV*
**BRANSTETTER, STRANCH
& JENNINGS, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gerards@bsjfirm.com

Christopher D. Jennings*
**THE JOHNSON FIRM**
610 President Clinton Ave, Suite 300
Little Rock, AR 72201
Tel: (501) 372-1300
chris@yourattorney.com

*Admitted Pro Hac Vice

*Counsel for Plaintiff and the Proposed Class*